on admission this morning before we start with the audience. Mr Garcia, when we come forward and I invite Judge Reyna to make a motion if he chooses. Thank you, Judge Newman. Um, colleagues, I move for the admission of Edwin Garcia. Edwin is a member of the bar and it's in good standing with the highest court of Texas. I have knowledge of his credentials and they're satisfies that he possesses the necessary qualifications. Edwin, this has been a year since you've come and joined my chamber and I'm sure that time has gone by pretty fast for you because that's what happens when when you work hard and when you're having fun. I have a sense that you had both in your services as a clerk to me. You've performed exemplary and your service both to my chambers and the court has been noted by the respect that you've developed among your peers. It's my colleagues before us stands an attorney that I'm sure will be an excellent practitioner in the future and will bring honor and dignity not only to this court but to the legal profession as a whole. Thank you. I invite the panel to vote on the motion. What say you, Judge in favor of the motion? I vote in favor of the motion. Thank you. Please approach the clerk to administer the oath. Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and in accordance with law, and that you will support the Constitution of the United States of America? I do. Welcome to the Bar of the United States of America. Thank you. Welcome to the Bar, Mr. Garcia. We will proceed with the program for this morning. The first argued case is number 18-1225, Verizon Therapeutics against Iancu. Mr. Olson. Good morning, Judge Nguyen, Judge Klovenger, Judge Reina. It's always a pleasure to be in front of this court. I want to start just by going back to the 559 patent in issue and just a quick review, which I know all of you are aware of, as to the claim, because it's important to understand the specific aspects of the claims in the 559 patent. As I think all of you know, other than the claim for Claim 3, the claims require, first, starting with a patient, but it's not any patient, it's a patient that's been designed or determined to have UCD. That patient has already been administered HPN 100 and has a fasting plasma ammonia level that's between the upper limit of normal and half the upper limit of normal. That's what the claims are about. Now, the claims require certain specific steps. Measuring first the fasting plasma ammonia level, comparing that to the upper limit of normal, and then administering an increased dose of HPN 100 if that ammonia level is greater than half the upper limit of normal. That's what's required by the claims. Those are all of the key aspects that you must find when you look at the prior art in order to find obviousness. Horizon's view is that the prior art's really devoid, absolutely devoid, of any teaching or reason that would motivate a person of ordinary skill in the art to increase the dose of HPN 100 if the patient's fasting blood ammonia was already below the ULN. And I have to say, I have found the finding of obviousness to be puzzling. Puzzling from this standpoint. What's the key reference that's relied on? It's the 859 publication. The 859 publication is a publication which I'm sure Judge Newman is going to recall. It morphed into eventually the 012 patent, which I had the honor of being in front of Judge Newman with respect to last year. The 012 patent was found to be valid by the board, and that was affirmed by this court in June of last year. Now the 859 publication, and using that as a key basis for finding obviousness, I find it puzzling because of many factors. But among others, if you look at what the patent, which came from that, or the publication itself, the 859 publication, says when you're dealing with using plasma ammonia level in order to determine how to treat a patient, how to do a dosing change if needed based on that. What happens if you have reason to believe that the plasma ammonia is going to spike in an individual who's already being treated with this particular pharmaceutical? And the circumstances are that you've tested this individual and they're at the low end range of normal, and there's an expectation that they're going to consume a lot of protein. Then there is an expectation that's fact-based that the ammonia level is going to spike, right? The probability of a spike can certainly be present depending upon the individual patient that's involved, but that has been... So I was wondering, the reason why I was asking was I was wondering about a situation where a patient may suffer from high blood pressure and is given a particular pharmaceutical to keep the blood pressure within range, and it's known that a couple of more milligrams will have this effect in terms of reducing, and you know that your patient is going to go into high altitude, for example, that will necessarily cause the blood pressure to spike even though it's being controlled. So as a matter of reason, why wouldn't one think to add a little more of the pharmaceutical if there are no side effects? Well, so let's start with a few things, Your Honor. Certainly, a physician is not going to give more dose of any product to a patient that isn't known to be needed because doctors just don't do that. Well, that's what you're trying to do. If your goal is to maintain my blood pressure in a normal range, and somebody says you take 20 mg of this stuff and it'll keep you from normal in a normal atmospheric range. But if you go in an altitude, we know your blood pressure is going to go up a certain number of points. And so the rational thing to do would be, and they can calculate how much more you take to bring your blood pressure into normal. But what I was saying is your initial explication of what the patent is doing seemed to me that it didn't take into account the possibility of a person who's within a normal range when measured fasting in the morning or whatever. But there's an expectation, and they're at the low end of the rank. There's an expectation that their plasma pneumonia will spike. And I think the important way to look at this, Your Honor, is... And if you have the additional amount of the pharmaceutical, the spiking will be taken care of. So if you look at the history here, because it's an obviousness issue, the question is, well, when was an issue determined to arise because of spiking during the use of a drug? It could have been any of the nitrogen scavenging agents over the years. And the fact is spiking certainly was recognized to occur. I mean, it's recognized all the way back to 1960 that that could occur. The use of nitrogen scavenging drugs has been out there for 40 years. And the purpose was to counteract the spiking, bring the number down, so to speak. Yeah. Well, it was always recognized that spiking could occur. But that was never used as a motivation to increase the dose of a nitrogen scavenging agent. And again, spiking is not new. This is why I find it to be somewhat astounding that based upon the teachings of the 859, there can be a conclusion of obviousness because spiking is not new news. It's old news. It's 60 years old. And the fact that nitrogen scavenging agents could be used as a method for reducing the level here of, it could be of a problem, is not an issue that was considered to be of such a nature that you needed to continue to take the level down below normal. Well, the question is not anticipation here. It's obviousness. And those of ordinary skill in the art who looked at this over a 40-year period never said, we need to continue to dose to take it, be leveled down below normal. That is never found. Well, it would be anticipated if that were the case. If one ordinary skill in the art in the past had recognized this problem and the way to solve it was with an additional dose. Well, not really. It depends upon how far we go here. I mean, there's nothing that says if a patient is at two or even three times. We've got the consensus paper, which is part of our argument here, which is a 2001 paper that is made up by some of the brightest people there. Saul Brusilow, for example, who invented, by the way, HPN 100, was there. And the consensus said, what? They said, we don't know whether we should give even a dose to a patient if they're only at the level of two to three times the upper limit of normal. So the fact that you could go above normal in a spike throughout the period has been recognized over this huge period of time of over 40 years, and no one said you should even treat once it's above, partially above the upper limit of normal. Half of it, for example, or twice, even up to three times. The art doesn't say that. How do you distinguish, and this is where I have troubles, how do you distinguish that kind of observation from the kind of observation that we seem to be stuck with with the Supreme Court, you know, the Mayo-Prometheus case, and an observation of a physiological fact, a law of nature, which is then the basis of diagnosis, a straightforward diagnosis, and then a known treatment? Well, we have more than that in this case, Your Honor. What we have is a recognition that comes from the 559 patent. You know, by the way, the 859 publication, of course, says don't use fasting ammonia levels, don't use ammonia levels at all as a basis for treatment. So what do we find then, and I can give you the quotes on that if you would like, but so what do we find coming out of the 559 patent? It's not just looking for something out there, it's looking for a problem, finding the problem, and finding the solution to that problem. We have affirmative steps that say once you determine that the patient is in this range of between half and the upper limit of normal, there is a need at that point to do treatment, and that's what the patent says, to increase a dose at that point. But it's not an issue that simply says don't do anything other than determine that there is a problem. It's got an affirmative step that says treat it. Treat it how? By making sure that if it's above half but below the upper limit of normal, you increase dose. That's not to be found anywhere. That's not an issue of prior art, and it's also not an internal issue in your body. It's at this point in time, it's the physician taking an affirmative step to change that. So I think it is totally distinguishable from the decision that you referred to, John. And I would like to emphasize here what the problem is. Where do you see then that the board made its error? I mean, I've understood what you're saying, but you're arguing in generalities. Give me a specific point where the board erred. Well, the board made many errors, but the biggest error I would say that they made is they essentially found the obviousness decision based upon their expert. And their expert specifically said that the reason that they found the way they did, their expert says there was a motivation to continue to increase the dose in order to get the level down below the upper limit of normal. And that's where the board turned to and said, why in order to prevent spiking and so forth? A POSA would have done that because there are spikings that can occur during the day. But their finding is not based on any art, and it's also not based from the standpoint of their expert. Their expert had nothing to support that position either because, again, if you look at what was out there available from a prior art standpoint, the only thing you have are articles that talk about treatment. But treatment from the standpoint of there's a need, maybe if you're up above three times that you want to increase a dose, but no motivation to take an affirmative action if the patient's already within the normal range. That's void. That's not there. It doesn't exist. The patient was in the normal range but at the risk of getting beyond the normal range. That was the thought I thought because he was at the lower end and there was an expectation of a spiking event. There is no expectation found in any prior art that would say that patient is not in good condition. That's the point because they were accepting at that time much, much higher levels to be OK. Two and three times the upper limit of normal. So, sure, spikes occurred, but there was no motivation once you were in that happy zone, at or around or slightly below or above the ULN. Physicians said that's good. They never said there's a problem. That's what was found by Dr. Sharsmith and the research that he did looking at this, the first ever 65 patients that had UCD and determined that there was a reason why you needed to lower that level. And if you look at the data that's in there, it shows that there is a vastly increased probability that the average during the day is going to be normal and that the amount of spiking that occurs is going to be below one and a half times the upper limit of normal. That was never seen before. That's where the motivation... I think I'm wrong. I thought there was understanding in the art that there was a goal to keep a medicated patient in the normal range. There was always... I mean, so you establish this goal and you say what we're trying to do is to keep the patient in the normal range, patients at the low end of the normal range. We're anticipating a spiking event which will push them out of the normal range, give them a little more of the pharmaceutical to keep them in the range. So as far as keeping... It's a matter almost of reason, not of common sense, but of reason. You say that's... It makes sense that if someone is at a lower range medicated, you're going to have a spiking event you know about. You know, if you add a little bit more of the pharmaceutical, you'll cataract the effect of the additional protein in order to bring the ammonia level, plasma ammonia level back down safely within the range. You know, Your Honor, I mean, that can be like your view or my view looking at it as not a POSA, but a POSA for 40 years. All of them had a chance to look at it. All I'm saying is I thought the evidence about the goal was a piece of the puzzle of why it was that one of our nursing home there would find a reason to do this. The piece of the puzzle that was needed was really the testing that was done for 65 patients that resulted in the data source that was then used by Dr. Scharchmitt to determine that there was a problem at that point. Because as I said, you have to look at obviousness from the standpoint of a POSA. And there was no article ever out there. No one ever went to a conference. No one ever said if there's a range that's above the upper limit of or at or below the upper limit of normal, we should still increase the dose. Nobody did that. And you can look at it from the standpoint to you're treating a patient and that patient has UCD. And it's very, very hard to maintain for a patient a level that is good for them. In fact, that's one of the big issues. If you look at the history here and why Dr. Scharchmitt did the work that he did, the numbers are devastating. You can find articles, for example, that show that the children, mainly children, in that level had numerous problems. They had cognitive problems and they had other life-threatening problems because the treatment wasn't good. But why wasn't it good? It wasn't because there was no recognition that there was a need to make this and to find that between half and the upper limit of normal was really a problem because no POSA is out there that had that feeling or wrote a book about it. The data didn't exist. Okay. Let's hear from the other side and we'll save some rebuttal time. Okay. Thank you, Jones. Ms. Kaplan. I said the other side. What happened to the petitioner in this case? Good morning, Your Honors. May it please the Court. The petitioner in this case dropped out after a settlement with Horizon Council. So why then? Why are you here? We're here to defend the Board's decision, finding that the claims here are obvious over the prior article. But where is the controversy to bring you to an Article III court? Well, under the AIA, the agency has the authority to intervene in these proceedings. That's not the question. The question is where is the controversy between antagonists? The director is the adjudicator. Well, the agency has an interest in defending the decisions of its agency. And the statute specifically permits the agency to intervene in these cases under the AIA. The agency may have an interest, but where is the Article III controversy? Again, the agency's authority to intervene in this case is dictated by statute. Congress authorized the agency to intervene. I think that answers the question. My recollection is that we've addressed this issue previously in a case. Do you have any familiarity with it? I can't remember the name of the case. I was on the panel. We've addressed it in various cases. Perhaps it was the Knowles case that addressed this issue. No, it was in the last year and a half. Last year and a half. We can look at it. Well, I proceed on the merits. Thank you, Your Honor. This is a fundamental issue. We appreciate the statute authorizes the director to intervene, but I don't see that it authorizes the director to substitute itself when there's no longer a controversy. That doesn't seem to have been contemplated in the statute that granted the right to intervene without making a motion to do so. Your Honor, we did move to intervene in this case, which was granted by the courts. But I will turn to the merits now. You moved to intervene. The motion was granted. Correct. As to the merits of the decision. The motion to intervene was made at an early stage. Yes, we have been automatically granting those motions, but the issue has been focused more clearly in recent cases. But proceed with the merits. If it were true that you didn't have standing to be here, then the decision would stand and the patent would be invalidated without any opportunity for the other party to, they would be able to appeal here, correct? That's correct, Your Honor. And you simply wouldn't be able to defend. Correct, Your Honor. I share Judge Newman's concerns as to whether we even have jurisdiction in this case. And I would propose that the parties provide a briefing on this particular issue so that we may resolve the question at a later time. It's a supplemental briefing, but it may be helpful. The issue has arisen in a number of cases, and so the briefing is being, but proceed with the merits. Your Honor, we're happy to provide additional briefing on that issue. And as to the merits of this case, Judge Clevenger pointed to the issue that's at issue here. There was an expectation that plasma ammonia levels will spike after eating. Blau teaches this clearly. In fact, Blau teaches that plasma ammonia levels after eating can spike between 30 to 60 micromoles per liter, which shows that one of ordinary skill in the art looking at Blau's teachings of the 859 publication would know that at the fasted state, a plasma ammonia level that indicates the, in case the concentration of ammonia being at a normal level or even below normal would indicate that once that individual ate something, their ammonia level would spike significantly. And thus, In your view, the POSA might see there's a problem to be solved. Correct, Your Honor. Also, the only error that horizons council has identified today is the board's reliance on Dr. Vo's testimony. And the board found that Dr. Vo is a person of ordinary skill in the art. That's because Dr. Vo has significant experience treating patients for over 20 years who had UCDs.  and because Dr. Vo's testimony is also supported by the prior. I said he was not an expert, but his testimony would be credited because he was a practitioner. Correct. It's because he was a practitioner and has had experience treating patients. In addition to that, Dr. Vo's testimony is supported by the prior record, including the Blau reference and the 859 publication. And thus the fourth decision here should be affirmed. And again, the 859 publication also taught the goal of maintaining blood plasma ammonia levels at 40 micromoles per liter or lower. And so the goal here was taught as was the fact that blood ammonia plasma levels can spike after eating. If there are no further questions, we ask that the court affirm the board's decision below. Mr. Green, three minutes of rebuttal. Thank you, judge. Dr. Inns was our expert. He is a person of extraordinary skill in the art. That is what he does is he treats UCD patients. He has been doing this for years. I don't want to get into Inns versus Dr. Fox, but I can say that the conclusion that council came to is wrong. Turning to Blau 859. If you look at Blau, it doesn't say a thing about increasing the dose for a patient who is below the upper limit of normal, but above half, there's no discussion on that. And the whole problem is the idea that there is motivation to do it is, again, missing because the prior art never went that direction. It was happy. Was there a problem to be solved? If you have a patient who is at the lower end of normal and is about to incur a spiking event, it was known that the plasma ammonia level would rise outside of the normal event. So here's a problem. The fact that there can be spiking. Yes, it was known for 40 years, 60 years. And what would be a reasonable, rational way to solve the problem? Well, if you look at what happened was to realize, give them a little bit more of the drug. The fact that there's spiking though, like you say, your blood pressure can go up during the day. And that doesn't mean you have to take blood pressure medication. This is because you have an interim spike for a moment. It doesn't necessarily mean that there's a problem. There's a difference between an interim spike and then a known event that's going to occur. It isn't a matter of normal fluctuation. You say, if I go into altitude, my blood pressure is going to go up 20 points. And every doctor could tell you that, and you would know it. And the doctor would say, take another 20 milligrams of the pharmaceutical. And let's assume. If there were, if there were demonstrated side effects, I mean, real high risks of taking the additional dose. It'd be scary. My understanding in this record was that there were no known with, with the PN100. There weren't any problems with side effects. Of additional dosage. There was none that was discussed. I certainly wouldn't be having this discussion with you at all. If there had been known side effects with additional doses, because you're not doing a patient any favor by giving it more high blood pressure medication. If it's going to drive them down to zero. Well, there can be side effect problems. In fact, we do have that. We do go through the fact. Well, there was a finding that you weren't, didn't challenge that on appeal. There was a finding that the HPN100 didn't have side effects. The A5. Sorry. Well, we did challenge the, the view that in fact, that there was no problem with increasing the dose. But you haven't challenged that on appeal as a fact finding. We have that in the reply brief. About HP on HPN100. It's a general statement that if you increase. HPN100, the evidence was that there was no side effects. No adverse side effects. Well, the only evidence that related to HPN100 is that evidence is in the A5.9, which had nothing to do with increasing doses whatsoever. And that's one of the most defined things is that there is a position taken that somehow the A5.9 patent was dealing with dose increases. It wasn't. The A5.9 patent, when it was looking at the data that resulted from the small clinical study that was done at that time, was a comparison between buprenorphine and HPN100. And all they did in that case is they took the same amount of active that would come and would be administered then to the individual patient and found in some instances when the HPN100 was given, yeah, there was a change, but it wasn't necessarily due. There's no indication as to the reason why there was a change. If you look at the table 12 in the A5.9 patent, you'll see some of the changes are actually kind of massive, but there was nothing that said that there was any control that was put on those patients when those levels were taken. Those levels that were taken were not designed to be, nor were they said to be fasting blood ammonia levels. And all it shows is when you changed the dosing for some of the patients, there was a, when you changed from buprenorphine to HPN100, there in fact was some change in the result for some of the patients, but you don't know what that was for. But my point is, it doesn't say to increase the dose anywhere in the A5.9 publication. And if you look at the A5.9 publication when it comes to dealing, and this is what I find puzzling, using plasma ammonia levels, it says A5.9 says plasma ammonia levels are less reliable and provide no direct information about whether the drug is actually working. It says that the A5.9 publication, it teaches only that urinary PAGN, which we had a discussion about a year ago, Judge Newman, with respect to the O1.2 patent, is convenient and reliable as a direct measure of the nitrogen scavenging effect. So as of the A5.9 timeframe, what did your principle reference say? It said, don't look at the value that you have for a fasting plasma ammonia level. Look at urinary PAGN. And because of that, I just can't envision how there was any motivation for EPOSA to do that. And there's no indication that EPOSA would have relied on the level. Okay. Any questions? Okay. Thank you. If we think that we need further briefing on anything, we will talk it over and we'll let you know at the moment. The case is taken under submission. Thank you.